UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Holborn Corporation,

    Plaintiff,

—v—

Sawgrass Mutual Insurance Company,

    Defendant.

16-cv-09147 (AJN)

MEMORANDUM
OPINION & ORDER

ALISON J. NATHAN, District Judge:

In this diversity action, Plaintiff Holborn Corporation asserts that Defendant Sawgrass Mutual Insurance Company breached its contract by failing to pay premiums to Holborn in exchange for Holborn acting as Sawgrass's reinsurance broker. Sawgrass asserts counterclaims against Holborn, alleging first that Holborn acted negligently and breached its fiduciary duty by failing to recommend a particular type of reinsurance, and second that Holborn breached its contract by failing to repay certain sums to Sawgrass. Before the Court is Holborn's motion to dismiss Counts I and II (negligence and breach of fiduciary duty) of Sawgrass's Amended Counterclaims under Federal Rule of Civil Procedure 12(b)(6). Because the Court concludes that New York law applies and that Sawgrass has failed to sufficiently allege facts that would support Sawgrass's claims under New York law, the motion is granted.

**I.   Background**

The following facts are taken from the allegations contained in the Defendant's Amended Counterclaims, as required in deciding this motion to dismiss. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). Defendant Sawgrass is a mutual insurance corporation existing in and organized under the laws of the state of Florida. Defendant/Counter-

Plaintiff's Amended Counterclaims ("Counterclaims"), Dkt. No. 22, ¶ 1. It writes homeowners insurance policies in the state of Florida. Counterclaims ¶ 4. Plaintiff Holborn is a reinsurance intermediary organized under the laws of the state of Delaware, with offices in New York, Minnesota, and Kansas. Counterclaims ¶ 2.

In 2012, Holborn had a series of conversations with Sawgrass's then-President and CEO, James Esse, aimed at convincing Esse to let Holborn procure reinsurance for Sawgrass. Counterclaims ¶ 5. During these conversations, Esse advised Holborn that it would need to "carefully analyze" Sawgrass's potential risk exposure under its homeowners policies, as well as "design a specific reinsurance program custom tailored to Sawgrass' unique business needs." Counterclaims ¶ 7. Given the magnitude of Sawgrass's risk, any reinsurance deal would likely require Sawgrass to pay nearly $10 million in annual reinsurance premiums for nearly $100 million in coverage. Counterclaims ¶ 8. Holborn was likely to receive nearly $1 million in annual commissions. Counterclaims ¶ 8. As a result, Sawgrass alleges, Holborn "understood that if Sawgrass retained it as its reinsurance intermediary that the relationship would be one of trust and confidence, and that Holborn would have a duty to counsel and advise Sawgrass on the reinsurance program that would be most advantageous to its particular business needs." Counterclaims ¶ 9.

In addition, according to Sawgrass, Holborn made "a series of representations concerning its expertise in an effort to induce Sawgrass to retain its services," which were "substantially the same" as the representations currently made on Holborn's website. Counterclaims ¶ 10. These representations include:

    a.    Holborn is an independent reinsurance brokerage offering advanced analytic tools, global market access, and responsive account services to clients across the United States.
    b.    Holborn is "committed to understanding each clients' needs, corporate

|   |   |
|---|---|
| c. | culture, risk tolerance and overall business approach." |
| c. | Holborn promises to "maintain a relentless commitment to giving clients what they truly need, with no two client solutions exactly the same." |
| d. | Holborn "take[s] a comprehensive approach to reinsurance structure design and placement by understanding each client's business philosophy and risk appetite. Each client team incorporates dedicated placement & claims brokers, cat modelers, actuaries, contracts professionals and accountants, who collaborate to deliver an exceptional client experience throughout the year. By being client focused, instead of product-focused, [its] team understands the whole picture and the implications of each recommendation and ultimate decision made by our clients." |
| e. | Holborn "keeps [its] finger on the pulse of both the traditional market and alternative market, when exploring risk solutions, to ensure [its] clients have the most efficient, innovative and secure reinsurance program available." |

Counterclaims ¶ 10. Sawgrass considered these representations material to its decision to retain Holborn and alleges that Holborn knew or should have known this. Counterclaims ¶ 11.

On March 14, 2012, Sawgrass executed a Broker Authorization Contract (the "2012 BAC"), which designated Holborn as Sawgrass's reinsurance intermediary from June 1, 2012 through May 31, 2015. Counterclaims ¶ 12; *see also* 2012 BAC, Dkt. No. 29-1. On November 6, 2013, Holborn and Sawgrass executed a superseding Broker Authorization Contract (the "2014 BAC"), which designated Holborn as Sawgrass's reinsurance intermediary from June 1, 2014 through May 31, 2017. Counterclaims ¶ 12; *see also* 2014 BAC, Dkt. No. 29-2. In addition, the parties signed two other agreements: a "Consulting Agreement" that amended the 2012 BAC and specified that Holborn would provide consulting services for a period of time even if the contract were terminated, Counterclaims ¶ 14, and a contract authorizing Sawgrass to use Holborn's proprietary Portfolio Optimization Tool, *see* Portfolio Optimization Tool Use Agreement, Dkt. No. 29-3.

According to Sawgrass, Holborn recommended a specific program of reinsurance coverage that it represented was the most advantageous for Sawgrass. Counterclaims ¶ 16. Based on these representations, Sawgrass purchased the recommended reinsurance.

3

Counterclaims ¶ 17. At some point thereafter, Sawgrass learned that Holborn had failed to recommend "Top and Drop" reinsurance coverage, a multi-layer insurance product which allows the insured to reuse the top excess-of-loss layer of reinsurance if it is not breached by the first loss event. Counterclaims ¶¶ 18-19. Sawgrass alleges that if Holborn had recommended Top and Drop coverage, Sawgrass would have saved hundreds of thousands of dollars. Counterclaims ¶ 20.

Sawgrass subsequently terminated Holborn pursuant to paragraph 2 of the 2014 BAC, which allowed Sawgrass to terminate Holborn at any time for cause. Counterclaims ¶ 27; 2014 BAC ¶¶ 2-3. On November 23, 2016, Holborn filed a complaint against Sawgrass alleging breach of contract. Complaint, Dkt. No. 1, ¶ 1. Specifically, Holborn alleged that Sawgrass "prematurely terminat[ed] the Contract without cause and fail[ed] to pay Holborn its full share of brokerage on all reinsurance procured or placed" during the period of time covered by the 2014 BAC. Complaint ¶ 1. In response, Sawgrass brought three counterclaims against Holborn alleging negligence, breach of fiduciary duty, and breach of contract. Counterclaims ¶¶ 34-55. Sawgrass alleges that Holborn's failure to recommend Top and Drop insurance constituted a breach of its duty of care, Counterclaims ¶ 40, and a breach of its fiduciary duty, Counterclaims ¶ 47. It also alleges that Holborn breached the terms of the 2014 BAC by failing to remit a percentage of the brokerage earned by Holborn as required. Counterclaims ¶¶ 53-54.

On April 11, 2017, Holborn filed a motion to dismiss Sawgrass's first and second counterclaims. Dkt. No. 27. Holborn argues that the tort-based claims of negligence and breach of fiduciary duty are barred by the economic loss doctrine under New York law and therefore must be dismissed. Memo. in Support of Motion to Dismiss ("Support"), Dkt. No. 28, at 1.

**II.    Legal Standard**

4

To survive a motion to dismiss under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim achieves "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Assessing the plausibility of a complaint is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. To plausibly allege a claim, the plaintiff must do more than provide "bare assertions" that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim. *Id.* at 681 (quoting *Twombly*, 550 U.S. at 555). "Plausibility thus depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). "A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint." *Orientview Techs. LLC v. Seven for All Mankind, LLC*, No. 13-cv-0538 (PAE), 2013 WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013) (citation omitted). In reviewing a motion to dismiss, the court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

### III. Discussion

Before the Court are Sawgrass's Counterclaims alleging the torts of negligence and

breach of fiduciary duty based on money Sawgrass lost due to Holborn's alleged failure to secure Top and Drop reinsurance for Sawgrass. Holborn argues that these claims are legally improper under New York's economic loss doctrine. "New York law holds that a negligence action seeking recovery for economic loss will not lie." *Cty. of Suffolk v. Long Island Lighting Co.*, 728 F.2d 52, 62 (2d Cir. 1984). In particular, if the parties have a remedy in contract, they may not also bring claims sounding in tort that claim only economic damages independent of physical injury or damage to property. This principle seeks to "prevent[] the encroachment of tort law into the domain of contract" and "protect[] parties' abilities to allocate risk by mutual agreement and thereby form reliable expectations about their potential financial exposure with respect to the duties and liabilities that they have contractually assumed." *Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of N.Y.*, 734 F. Supp. 2d 368, 379 (S.D.N.Y. 2010). However, an exception to the economic loss doctrine exists "where the defendant has a duty independent of contractual obligations." *Nebraskaland, Inc. v. Sunoco, Inc.*, No. 10-cv-1091 (RJD) (CLP), 2011 WL 6131313, at *4 (E.D.N.Y. July 13, 2011) (report and recommendation) (citation omitted), *adopted* 2011 WL 6131298 (E.D.N.Y. Dec. 8, 2011).

Because the relationship between Holborn and Sawgrass is governed by the contracts they executed (namely, the 2012 BAC and 2014 BAC), the economic loss doctrine would generally bar Sawgrass's tort-based counterclaims. To avoid application of the economic loss doctrine, Sawgrass makes two arguments. First, it argues that this case should be governed by Florida law rather than New York law. Because Florida recognizes only a much narrower economic loss doctrine that applies only to product liabilities cases, Sawgrass's counterclaims may be properly brought if Florida law governs. Second, Sawgrass argues that Sawgrass and Holborn formed a special relationship giving rise to duties "independent of contractual

obligations," *Nebraskaland*, 2011 WL 6131313, at *4 (citation omitted), and that Sawgrass may bring legal theories alleging breaches of those independent obligations. For the reasons explained below, the Court disagrees with Sawgrass's contentions.

A.     **New York Law Governs this Case**

In response to the motion to dismiss, Sawgrass first argues that Florida law, rather than New York law, applies to this case and that, as a result, New York's economic loss doctrine is inapplicable. Memo. in Opp. to Motion to Dismiss ("Opp."), Dkt. No. 35, at 6. The Court concludes that New York law governs this case.

1.     **Choice-of-Law Doctrine**

"Because a choice of law analysis is fact intensive, courts often decline to make a choice of law determination at the motion to dismiss stage." *Smith v. Railworks Corp.*, No. 10-cv-3980 (NRB), 2011 WL 2016293, at * 6 n.12 (S.D.N.Y. May 17, 2011). "But where . . . the relevant facts are sufficiently clear, courts in this Circuit have engaged in choice-of-law analysis at the motion to dismiss stage." *Patel v. New York Life Ins. Co.*, No. 11-cv-4895 (JPO), 2012 WL 1883529, at *3 (S.D.N.Y. May 21, 2012).

"A federal court exercising diversity jurisdiction must apply the choice of law analysis of the forum state." *GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006). "In New York, . . . the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). An actual conflict of law exists if "the applicable law from each jurisdiction provides different substantive rules," *id.*, and the differences "have a 'significant *possible* effect on the outcome of the trial,'" *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) (quoting *Simon v. Philip Morris, Inc.*, 124 F. Supp. 2d 46,

7

71 (2002)).

If an actual conflict exists, courts must decide which choice-of-law test is most appropriate. "The New York Court of Appeals has held that 'the relevant analytical approach to choice of law in tort actions in New York' is the '[i]nterest test.'" *GlobalNet Financial*, 449 F.3d at 384 (alteration in original) (quoting *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 684 (N.Y. 1985)). Under this test, courts "seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997)). The states' interests are defined primarily by "the parties' domiciles and the locus of the tort." *Schultz*, 480 N.E.2d at 684. New York tort laws are either considered conduct-regulating or loss-allocating depending on their primary purposes. *GlobalNet Financial*, 449 F.3d at 384. "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *White Plains Coat & Apron Co.*, 460 F.3d at 284 (quoting *Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277, 280 (N.Y. 1993)). New York courts treat negligence and breach of fiduciary duty laws as conduct-regulating laws. *Rose v. Arthur J. Gallagher & Co.*, 928 N.Y.S.2d 783, 784 (App. Div. 2011).

While the parties generally agree that the above standards govern the Court's choice-of-law inquiry, *see* Support at 7-9; Opp. at 6-7, they disagree on which Second Circuit precedent interpreting New York law governs when the allegedly tortious conduct and the resulting injury happen in different locations. Sawgrass relies on the Second Circuit's statement in *White Plains Coat & Apron Co.* that "where negligent conduct occurs in one jurisdiction but the plaintiff's injuries are suffered in another, the situs of the tort is where the last event necessary for liability

8

occurred." 460 F.3d at 285; Opp. at 7, 11 (citations omitted). Holborn, on the other hand, points to the Second Circuit's decision in *Licci ex rel. Licci v. Leb. Can. Bank, SAL*, 739 F.3d 45 (2d Cir. 2013), which "reject[ed] the view . . . that the law of the place of injury ordinarily or always governs where conduct-regulating rules are involved" and instead held that "where [wrongful conduct and injury] do not [take place in the same jurisdiction], it is the place of the allegedly wrongful conduct that generally has superior 'interests in protecting the reasonable expectations of the parties who relied on [the laws of that place] to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future.'" 739 F.3d at 50-51 (third alteration in original) (quoting *Schultz*, 480 N.E.2d at 684-85); *see also* Support at 9.

The Court concludes that it must follow the decision in *Licci* and presume that the state with the greatest interest in this case is the state in which the alleged wrongful conduct occurred. In reaching this conclusion, the Court relies on the fact that in *Licci*, the Second Circuit explicitly considered whether the law of the place of injury or the law of the place of wrongful conduct governed a choice-of-law analysis in New York. *See Licci*, 739 F.3d at 50-51. In contrast, in *White Plains Coat & Apron Co.*, the Second Circuit considered both where the majority of the conduct had taken place and where plaintiffs' injuries had occurred simultaneously in determining which state had the greatest interest in the case. *See* 460 F.3d at 284-85. As a result, *White Plains Coat & Apron Co.* does not stand for the proposition that the location in which a plaintiff was injured has a greater interest than the location in which the wrongful conduct occurred.

Additionally, the case on which the Second Circuit relied in *White Plains Coat & Apron Co.* for the proposition that the location of the last event necessary for liability had the greatest interest was *Schultz v. Boy Scouts of America*, a case that concerned states' interests in loss-

allocating laws rather than conduct-regulating laws. *See Schultz*, 480 N.E.2d at 685; *see also White Plains Coat & Apron Co.*, 460 F.3d at 285 (citing *Schultz* for the proposition that in New York, "the situs of the tort is where the last event necessary for liability occurred"). In *Schultz*, the New York Court of Appeals concluded that where conflicting laws were loss-allocating, "the locus jurisdiction has at best a minimal interest in determining the right of recovery or the extent of the remedy," while the injured party's domiciliary state has an interest in seeing that its "loss-distributing rules are enforced so that the underlying policy . . . is effectuated." 480 N.E.2d at 685-86. As a result, *Schultz* is inapposite to application of the interest test for conduct-regulating tort laws, and thus the statement in *White Plains Coat & Apron Co.* relying on *Schultz* is similarly inapposite to the choice of law analysis in this case where conduct-regulating laws are at issue.

Finally, the rule in *Licci* is most consistent with the Second Circuit's holding in *GlobalNet Financial*, the case that most resembles this controversy, and in which the Court of Appeals affirmed the District Court's conclusion that New York law rather than Florida law should govern a tort claim relating to an insurance broker's failure to notify its client of important information. 449 F.3d at 384-85. In *GlobalNet Financial*, the Second Circuit disagreed with the appellant's contention that "its tort claims should be analyzed under the substantive law of Florida because that state has a significant interest in regulating the conduct of brokers who knowingly deal with a Florida-based insured to provide coverage for a risk that was primarily located in Florida." *Id.* at 385. Instead, it concluded that the District Court had correctly determined that "New York has a greater interest than Florida in this litigation involving a tort that occurred [in New York] and in regulating the conduct of brokers, insurance agents, premium finance companies and insurers licensed within the state." *Id.* (alteration in

original). In reaching this conclusion, the Second Circuit pointed to the fact that the defendant was "licensed in New York and maintain[ed] its principal place of business in New York." *Id.* The Court further reasoned that because the defendant received mail and phone calls at its New York office, the defendant's failure to notify the plaintiff of information it had received "was centered in New York." *Id.* (citing *Northwestern Mutual Life Ins. Co. v. Wender*, 940 F. Supp. 62, 66 (S.D.N.Y. 1996)). In reaching its conclusion, the Second Circuit clearly assumed that the location of the insurance company's allegedly tortious conduct was the operative consideration rather than the location in which the plaintiff was injured. As a result, this Court adopts the same approach and presumes that the state in which tortious conduct occurred will be the state whose substantive law applies.

### 2. Application to the Present Case

The Court first concludes that it must undertake a choice-of-law analysis because there is an actual conflict of law. As both parties recognize, New York prevents insureds from suing insurance brokers in tort under the economic loss doctrine, while under Florida law, the economic loss doctrine is limited to product liability cases. Support at 8; Opp. at 6. *Compare Cornelia Fifth Ave., LLC v. Canizales*, No. 12-cv-7660 (ALC), 2017 WL 1034644, at *4 (S.D.N.Y. Mar. 16, 2017) (explaining New York's economic loss doctrine), *with Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos.*, 110 So. 3d 399, 407 (Fla. 2013) (explaining that Florida's economic loss doctrine applies only in products liability). Thus, New York and Florida employ different substantive rules that have a "significant *possible* effect on the outcome of the trial," *Fin. One Pub. Co.*, 414 F.3d at 331 (citation omitted), by potentially eliminating two of Sawgrass's counterclaims.

The Court next concludes that New York has the greatest interest in this case, and that

11

New York law therefore governs Sawgrass's counterclaims. While it is undisputed that Sawgrass suffered injury in Florida where it is domiciled, the Court finds that the actual tortious conduct alleged in Sawgrass's counterclaims occurred in New York. The wrongful conduct alleged in Sawgrass's counterclaims is a failure to recommend Top and Drop insurance. Sawgrass alleges that Holborn was negligent because it "breached its duty of care by failing to use reasonable skill and care to recommend and secure appropriate reinsurance for Sawgrass, including Top and Drop coverage." Counterclaims ¶ 40. Likewise, Holborn "breached its fiduciary duty by failing to recommend and secure the reinsurance products appropriate for Sawgrass' particular business needs, including Top and Drop coverage." Counterclaims ¶ 47. Sawgrass repeatedly characterizes Holborn's tortious conduct as a "failure to recommend and secure" Top and Drop coverage, Counterclaims ¶ 21; *see also* Counterclaims ¶ 18 ("Sawgrass learned that Holborn, contrary to its duties and fiduciary obligations, failed to recommend a reinsurance product known as 'Top and Drop' reinsurance coverage ('Top and Drop')."). This failure occurred when Holborn considered, recommended, and secured reinsurance for Sawgrass.

The Court finds that Sawgrass has failed to plausibly allege that this failure occurred in Florida. Specifically, Sawgrass does not allege with particularity that Holborn's agents were in Florida when they were considering and selecting reinsurance or when they recommended a particular reinsurance plan to Sawgrass. Rather, Sawgrass only specifically states that Holborn agents traveled to Florida "to meet with Sawgrass during the course of negotiations" and more generally alleges that Holborn agents traveled to Florida during the course of "the ensuing relationship." Counterclaims ¶ 28. It does not specifically allege that any of these meetings concerned Holborn's choice of a reinsurance plan or its recommendation of that reinsurance plan to Sawgrass. Similarly, in its opposition to Holborn's motion to dismiss, Sawgrass does not

allege that any of Holborn's actions other than its alleged pre-contract representations about the services it would provide took place in Florida:

> Here, Holborn traveled to Florida, and while in Florida made representations to Sawgrass that it would custom tailor a reinsurance program to meet its unique business needs. Holborn then drafted and presented a Reinsurance Contract to Sawgrass that itself contained a Florida choice of law provision, which Holborn recommended Sawgrass execute because it met its business needs, and which Sawgrass executed in Florida.

Opp. at 10. Sawgrass specifically avoids asserting that Holborn was in Florida during the consideration, drafting, or presentation of the proposed reinsurance contract. Further underscoring the dearth of specific allegations that the purportedly tortious conduct took place in Florida is Sawgrass's argument in its opposition to the motion to dismiss that the allegedly tortious conduct may have occurred in Minnesota or Kansas. In arguing against application of New York law, Sawgrass states that "Holborn also maintains offices in Minnesota and Kansas, and is incorporated in Delaware," and that "there is no record support for what activities occurred at any of Holborn's varied locations." Opp. at 10. In effect, Sawgrass admits that it does not know where Holborn was when it acted but that Holborn's allegedly tortious conduct took place at one of its locations rather than in Florida during any meeting between Sawgrass and Holborn.[1] As a result, the Court concludes that Sawgrass's allegations fail to rise above the level of "bare assertions" that tortious conduct occurred in Florida, which cannot be credited. *See Iqbal*, 556 U.S. at 681. The Court finds that the allegedly tortious actions of Holborn occurred in

---

[1] The Court separately rejects Sawgrass's contention that Holborn's conduct may have occurred in Minnesota or Kansas rather than in New York. Nowhere in the Amended Counterclaims does Sawgrass allege that Holborn conducted any business related to Sawgrass out of its other offices or that it has reason to believe that any of the agents with whom Sawgrass worked traveled to these other offices. The only reference to these other offices in the Counterclaims is the statement that "[u]pon information and belief, Holborn . . . [has] offices in New York, Minnesota, and Kansas." Counterclaims ¶ 2. But the contracts that are incorporated into the Amended Counterclaims all require communications between Sawgrass and Holborn to be sent to Holborn's New York office. *See* 2012 BAC at 2, 3; 2014 BAC at 3.

13

New York. As in *GlobalNet Financial*, Holborn is licensed in New York and its principal place of business is New York. Counterclaims ¶ 2; Support at 3; 2012 BAC at 2, 3; 2014 BAC at 3; NY License, Dkt. No. 29-4. The contracts between Sawgrass and Holborn required all communications with Holborn to be sent to a New York address and that Holborn's agent could be reached at a New York City phone number. 2012 BAC at 2, 3; 2014 BAC at 3. Holborn's failure to recommend a specific policy therefore is centered in New York under *GlobalNet Financial* (and absent contrary specific allegations by Sawgrass), and the Court concludes that New York has the greatest interest in this case. *See Licci*, 739 F.3d at 50-51; *GlobalNet Financial*, 449 F.3d at 385.

Sawgrass argues that even if Holborn's failure to recommend Top and Drop insurance occurred in New York, Florida law should nevertheless govern this case because Holborn made fraudulent misrepresentations during meetings with Sawgrass in Florida. Opp. at 8. Specifically, Sawgrass states that its claims "relate to the misrepresentations Holborn made that it would carefully analyze Sawgrass' potential exposure and recommend a specific reinsurance program custom tailored to its needs, and then failed to do so resulting in damages." Opp. at 8. This claim is unavailing. Sawgrass has not sued Holborn for fraud or alleged that Holborn knowingly made misrepresentations to Sawgrass. Rather, Sawgrass claims that Holborn's *later failure to fulfill these promises* was negligent and a breach of fiduciary duty. As a result, the tortious conduct at issue in Sawgrass's counterclaims is that subsequent failure, not the initial representations. Because Sawgrass has not sufficiently alleged that Holborn's failure occurred in Florida, and against the backdrop of *GlobalNet Financial*, the Court concludes that the alleged failure occurred in New York and thus is governed by New York law.

The Court likewise sees no merit in Sawgrass's argument that Florida law applies in this

case because the reinsurance contract Sawgrass ultimately signed with third parties was executed in Florida and governed by Florida law. Opp. at 8. Holborn was not a party to that contract, nor did that contract implicate Holborn's contractual relationship to Sawgrass. *See* Reinsurance Contract, Dkt. No. 35-1. Rather, the contract merely governed the obligations between Sawgrass and its many reinsurers. As a result, although that contract has a choice-of-law provision stating that Florida law governs the contract, Reinsurance Contract at 22, that contract has no bearing on where Holborn's allegedly tortious conduct occurred or which state has the greatest interest in the actions by the reinsurance broker rather than the actions of the reinsured and reinsurers. *See GlobalNet Financial*, 449 F.3d at 385 (holding that a state did not have the greatest interest in a tort arising from an insurance relationship merely because the ultimate insurance risk would be borne in that state).

Sawgrass next argues that, despite the normal rule that the state in which a conduct-regulating tort occurred will generally have the greatest interest in the case, *see White Plains Coat & Apron Co.*, 460 F.3d at 284, Florida has the greatest interest in this case, Opp. at 11. In support of this position, Sawgrass states that it is domiciled in Florida, Holborn traveled to Florida to negotiate its relationship with Sawgrass, the reinsurance Holborn secured covered exclusively Florida risks on Florida-issued insurance policies, and the ultimate reinsurance contract secured by Holborn had a choice-of-law provision applying Florida law. Opp. at 11. This argument is largely foreclosed by the Second Circuit's holding in *GlobalNet Financial*. In that case, the plaintiff likewise argued that Florida had the greater interest because the plaintiff was domiciled in Florida and the defendant had provided insurance coverage "for a risk that was primarily located in Florida." 449 F.3d at 385. Nevertheless, the Second Circuit concluded that New York had the greater interest in the outcome because it was where the defendant's conduct

had occurred. *Id.* Because the facts of *GlobalNet Financial* are not meaningfully distinguishable from the facts presented here, the Court disagrees with Sawgrass's suggestion that Florida law should govern.

Finally, Sawgrass counsels that if the Court is not persuaded that Florida law applies, it should defer ruling on the choice-of-law question until after discovery has occurred. Opp. at 7, 12-13. In support of this position, it states only that delaying resolution of the question until after discovery "will allow the parties to present the Court with additional facts germane to the issue." Opp. at 12. While the Court recognizes that courts often decline to rule on choice of law at the motion to dismiss stage because it requires fact-intensive analysis, *Smith*, 2011 WL 2016293 at *6 n.12, the Court finds it appropriate to rule that New York law governs this case. The Court's determination in this case does not require a fact-intensive inquiry: even treating all of Sawgrass's allegations as true and viewing all facts in the light most favorable to it, it has failed to allege any facts that would cause Florida law to govern this case. Because the failure is one of pleading rather than one of factual support, the Court sees no reason to allow the choice-of-law issue to become the subject of extensive discovery. *See Patel*, 2012 WL 1883529, at *4 (deciding the choice of law question at the motion to dismiss stage because plaintiff had not plausibly alleged that the locus of the tort had been anywhere other than Georgia).

The Court thus concludes that New York law governs Sawgrass's counterclaims. As a result, New York's economic loss doctrine will foreclose Sawgrass's claims absent application of an exception to that general rule.

### B. The Parties Did Not Have a Special Relationship Creating Additional Duties Owed by Holborn to Sawgrass

Sawgrass next argues that the economic loss doctrine is inapplicable in this case because the parties had a special relationship giving rise to additional duties independent of the operative

16

contracts. Under New York law, insurance brokers "have a common-law duty to obtain requested coverage for their clients within a reasonable time or inform the client of the inability to do so" but "have no continuing duty to advise, guide or direct a client to obtain additional coverage." *Am. Bldg. Supply Corp. v. Petrocelli Grp., Inc.*, 979 N.E.2d 1181, 1184 (N.Y. 2012) (quoting *Murphy v. Kuhn*, 682 N.E.2d 972, 974 (N.Y. 1997)). However, the New York Court of Appeals has held that "[w]here a special relationship develops between the broker and client," the broker "may be liable . . . for failing to advise or direct the client to obtain additional coverage." *Voss v. Neth. Ins. Co.*, 8 N.E.3d 823, 828 (N.Y. 2014). A special relationship may be established in one of three ways:

> (1) the agent receives compensation for consultation apart from payment of the premiums, (2) there was some interaction regarding a question of coverage, with the insured relying on the expertise of the agent, or (3) there is a course of dealing over an extended period of time which would have put objectively reasonable insurance agents on notice that their advice was being sought and specially relied on.

*Murphy*, 682 N.E.2d at 975-76 (citations omitted).

If a special relationship exists, the special duties that attach to the parties are "governed by the particular relationship between the parties and [are] best determined on a case-by-case basis." *Id.* at 975. An insurance broker may be found negligent for failure to fulfill the duties that attach due to a special relationship. *See Voss*, 8 N.E.3d at 828-29. A special relationship will also support a claim for breach of fiduciary duty because "[t]he 'duty' element of [negligence and fiduciary duty] causes of action requires the same inquiry." *Muller-Paisner v. TIAA*, 289 F. App'x 461, 465 (2d Cir. 2008); *see also Edelman v. O'Toole-Ewald Art Assocs., Inc.*, 814 N.Y.S.2d 98, 99 (App. Div. 2006) ("[I]nsurance companies do not owe a fiduciary duty to their insureds, absent a showing of some special relationship."). "[S]pecial relationships in the insurance brokerage context are the exception, not the norm . . . ." *Voss*, 8 N.E.3d at 829.

17

Insureds bear the burden of proving a special relationship. *Murphy*, 682 N.E.2d at 976.

Sawgrass alleges that a special relationship existed between itself and Holborn based on the second method identified in *Murphy*: an interaction regarding a question of coverage with the insured relying on the expertise of an agent. Opp. at 14-18. In order to satisfy this requirement, courts have generally required that the insured make a specific request about the feature of the proposed insurance at issue in the subsequent suit. For example, in *Voss*, the plaintiff asked the defendant whether an insurance policy that covered $75,000 in loss due to business interruption would be sufficient for her based on the size and revenue of her business. 8 N.E.3d at 825-26. The defendant "allegedly assured her that it would suffice based on . . . the size of her businesses," and the plaintiff subsequently accepted the policy. *Id.* at 826. The Court of Appeals concluded that a special relationship might exist, and thus summary judgment was inappropriate, because the two parties "discussed business interruption insurance from the inception of their business relationship," the defendant obtained "relevant data in order to calculate the proper level of coverage," and the plaintiff "questioned that amount [of $75,000 of coverage]" and the defendant "assured her that it was adequate based on his review of her business finances." *Id.* at 829. In contrast, in *Murphy*, the Court of Appeals found no special relationship between an insurer and insured where the plaintiff "never asked [the defendant] to increase the liability limits" on the auto insurance policy at issue and, "[i]n fact, there is no indication that [the plaintiff] ever inquired or discussed with [the defendant] any issues involving the liability limits of the automobile policy." 682 N.E.2d at 975. The court concluded that "[s]uch lack of initiative or personal indifference cannot qualify as legally recognizable or justifiable reliance." *Id.*

Here, Sawgrass has not alleged that a particular conversation about Top and Drop

insurance ever occurred between the parties, nor has it alleged that it relied on Holborn to procure Top and Drop insurance specifically. Instead, Sawgrass merely alleges that it required Holborn "to carefully analyze Sawgrass' potential exposure . . . [and] design a specific reinsurance program custom tailored to Sawgrass' unique business needs." Counterclaims ¶ 7. Similarly, Sawgrass argues that Holborn recommended a reinsurance policy "that it represented as having been the most advantageous for its unique business needs," and that Sawgrass "relied on Holborn's analysis and recommendations and purchased the reinsurance that Holborn recommended." Counterclaims ¶¶ 16-17. An alleged conversation in which the parties discussed "the most advantageous" policy – without either party specifically mentioning Top and Drop insurance – is insufficient to create a special relationship under *Murphy*. *See* 682 N.E.2d at 975. All insurance customers are seeking the most advantageous insurance policy, and as a result, a discussion generally about what policy will be the most advantageous does not suggest "that the Plaintiff enjoyed anything other than an ordinary consumer-agent insurance relationship." *Long Beach Road Holdings, LLC v. Foremost Ins. Co.*, 75 F. Supp. 3d 575, 590 (E.D.N.Y. 2015). If such a generalized and common inquiry were sufficient to create a special relationship between an insurance broker and customer, courts would be required to find the existence of a special relationship in nearly every insurance purchase and the exception would swallow the general rule. *See Voss*, 8 N.E.3d at 829 (describing a special relationship between an insurance broker and customer as the "exception" to the general rule).

Sawgrass argues that it need not allege "the *precise* coverage discussed, and the *precise* question presented" because only a short, plain statement of the claim is required at the motion to dismiss stage. Opp. at 15 n.7 (discussing the requirement of Federal Rule of Civil Procedure 8(a)(2)). While the Court agrees that Sawgrass need not plead every fact in its Amended

Counterclaims, Rule 8(a)(2) requires it to plead a sufficient statement to "show[] that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2). In this case, Sawgrass has failed to allege sufficient facts to demonstrate that a special relationship was created between itself and Holborn that would require Holborn to recommend Top and Drop reinsurance. It has thus failed to allege that it is entitled to relief for Holborn's actions under either a negligence theory or breach-of-fiduciary-duty theory.

## IV. Conclusion

Plaintiff's motion to dismiss Counts I and II of Defendant's Amended Counterclaims is granted. This resolves Docket Number 27.

The Court will schedule an initial pretrial conference in this matter under separate order.

SO ORDERED.

Dated: January 17, 2018
New York, New York

_____
ALISON J. NATHAN
United States District Judge